IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FREDDIE CHARLES THOMPSON   *
    Plaintiff,
 v.       *   CIVIL ACTION NO. RWT-06-2588

DR. RAKHEED MALIK     *
OFFICER BREEDEN
    Defendants.   *
        ***

**MEMORANDUM OPINION**

I. PROCEDURAL HISTORY

Plaintiff filed this 42 U.S.C. § 1983 civil rights complaint for damages, dated September 30, 2006, complaining that on several occasions the Maryland Correctional Institution in Hagerstown ("MCI-H") medical department refused to test his sugar levels as requested and informed him there was nothing wrong with him and he was faking. (Paper No. 1 at 3). According to the Complaint, Plaintiff suffered a diabetic stroke and now has difficulty reading or writing correctly. (Id. at 2). Plaintiff also claims that Officer Breeden was the desk officer in the dispensary and threatened him with disciplinary segregation if he did not go back to his housing unit. (Id. at 3). Named as Defendants are Dr. Rakesh Malik[1] and Office Thomas Breeden.

On January 16 and March 12, 2007, Defendants filed Motions to Dismiss or, in the Alternative, Motions for Summary Judgment, which shall be treated as summary judgment motions. (Paper Nos. 12 & 17). After being afforded notice of the dispositive pleadings, Plaintiff filed his Opposition to Defendant Malik's Motion. (Paper No. 19). The matter is ready for consideration. An oral hearing is unnecessary. See Local Rule 105.6 (D. Md. 2004).

---

[1] The Clerk shall amend the docket to reflect the proper spelling of Dr. Malik's first name.

II.     STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. See Celotex, 477 U.S. at 322-323. Therefore, on those issues for which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

III.    DISCUSSION

1. Facts

Plaintiff is a sixty-one-year-old inmate with a history of hypertension, cirrhosis of the liver, hip replacement, and gout. Although his Complaint and Opposition make reference to the failure of medical personnel to take his blood sugar levels (see Paper Nos 1 & 19), Plaintiff does not have diabetes. (Paper No. 12, Ex. A; Ex. B at 1). On May 12, 2006, Plaintiff was evaluated by Dr. Malik as a walk-up patient in the MCI-H dispensary, complaining of blurred vision and left arm numbness.[2] (Id., Ex. A; Ex. B at 10). Dr. Malik checked Plaintiff's blood pressure, found it to be higher than normal, and doubled Plaintiff's dose of Lopressor and Vasotec.[3] (Id.). Plaintiff's blood

---

[2] Plaintiff stated that he was seeing black dots, had pain above his right eye, and had not been "feeling right" since his medication was changed. (Paper No. 12, Ex. A).

[3] Prior to May of 2006, Plaintiff had been placed on a medication regimen of Lopressor and Vasotec to treat hypertension. (Paper No. 12, Ex. B at 75-77, & 79).

pressure was monitored for one month and controlled further with additional doses of clonidine when necessary. (Paper No. 12, Ex. A; Ex. B at 11-12). Dr. Malik opines that hypertension often causes visual disturbances and headaches. (Id., Ex. A).

On May 14, 2006, Plaintiff submitted a sick-call form complaining of the same symptoms. (Id., Ex. A; Ex. B at 12). When seen by medical staff, however, he stated that he was not experiencing numbness, chest pain, shortness of breath, or diaphoesis (excessive sweating). (Id.). In addition, Plaintiff did not seem to be in any distress. (Id.). His blood pressure was slightly elevated at 150/84 and his only complaint was that he had missed his 1:00 p.m. medications. (Id.) He was advised to return for his evening medications. (Id).

On June 15, 2006, Dr. Malik evaluated Plaintiff in the Chronic Care Clinic ("CCC"). (Id., Ex. A; Ex. B at 16-20). Plaintiff indicated that he felt fine and offered no complaints of vision problems or numbness. (Id.). Dr. Malik noted that Plaintiff was not compliant with his low sodium diet or taking clonidine as prescribed. He discontinued Plaintiff's prescriptions for clonidine and Lopressor and and started Plaintiff on Verapamil for control of hypertension. (Id.; Ex. A; Ex. B at 16-20, 70, & 80). Dr. Malik also recommended that Plaintiff be placed on the bottom bunk permanently because of his prior hip replacement. (Id., Ex. A; Ex. B at 21).

In August of 2006, Plaintiff was seen by health care staff on three separate ocassions. On August 5, 2006, he came to the MCI-H dispensary as a walk-up patient complaining of high blood pressure. (Id., Ex. A.; Ex. B at 22). His blood pressure was, however, measured as 134/80, and his speech and gait were found to be clear and steady. He was advised to return to the dispensary as needed. (Id.). On August 6, 2006, Plaintiff submitted a sick-call form complaining of numbness down the right leg to the foot. (Id., Ex. A; Ex. B at 23). Dr. Malik affirms that this symptom is not indicative of a stroke, but is rather related to Plaintiff's history of arthritis. (Id., Ex. A). He indicates

that Plaintiff never exhibited any loss of muscle strength that would be indicative of a stroke. (Paper No. 12, Ex. A.) On August 31, 2006, Plaintiff submitted a sick-call form complaining of high blood pressure and the inability to think. (Id., Ex. A; Ex. B at 24-25). He stated that he could not see peripherally and that he had black dots in his vision. He denied missing any of his blood pressure medications. (Id.) His blood pressure was checked and found to be 118/80 in his left arm and 118/90 in his right arm. His heart rate was 50. The nurse conferred with Dr. Malik and was told to give Plaintiff an aspirin and to have the nurse practitioner evaluate Plaintiff. (Id.). The nurse practitioner's examination of the same date showed that Plaintiff had a loss of peripheral vision to the right in both eyes and bradycardia (a slow heart rate). (Id., Ex. A; Ex. B at 26). His grip strength was only slightly decreased. (Id.) Plaintiff was scheduled to be reevaluated the following day. (Id.).

On September 1, 2006, Plaintiff reported feeling dizzy. The nurse evaluated Plaintiff and noted that he admitted to missing some doses of hypertension medication and not eating for three days. (Id., Ex. A; Ex. B at 27). His physical examination showed an elevated blood pressure (180/108) and Plaintiff seemed confused and forgetful about his medications and diet. (Id.). Urine dipstick testing was negative for glucose. (Id., Ex. B at 28). Plaintiff was instructed to drink water and eat meals. (Id., Ex. B at 27). The nurse also noted that Plaintif was scheduled for a follow-up with the physician's assistant or nurse practitioner on September 5, 2006, and that an assessment would be made regarding Plaintiff's hypertesion medications. (Id.). On September 2, 2006, Plaintiff blood pressure was checked and found to be within normal limits. (Id., Ex. B at 29). On September 3, 2006, Plaintiff complained of decreased and blurred vision in his right eye. (Id., Ex. A; Ex. B at 29). He denied diplopia (double-vsion) and showed no signs or symptoms of neurological deficit. (Id.). His non-fasting blood sugar was slightly elevated (114). Plaintiff was given a cane to assist

with ambulation.  (Id., Ex. A; Ex. B at 30-31).  On September 4, 2006, however, Plaintiff appeared in the dispensary complaining that he could not "see right."  (Paper No. 12, Ex. A; Ex. B at 32).  He submitted to a neurological evaluation by Dr. Malik, who found Plaintiff's condition normal.  (Id., Ex. A; Ex. B at 32-33).  Dr. Malik ordered neurological checks every day for five days, and blood pressure checks every other day for one week.  (Id. Ex. A; Ex. B at 71).  Dr. Malik also ordered a CT scan of Plaintiff's brain because of his decreased vision.  (Id.).

Before the CT scan could be performed, on September 5, 2006, Plaintiff was found unconscious in his cell.[4]  (Id., Ex. A; Ex. B at 34-35).  He was taken to the dispensary, where he responded to painful stimuli at first and then opened his eyes and responded verbally to the nurse when asked to so do.  (Id.)   The nurse was able to take Plaintiff's blood pressure and found it low to normal.  His blood sugar levels were elevated (132).  Dr. Malik ordered that the scheduled CT scan be performed immediately, and Plaintiff was transported to Washington County Hospital ("WCH").  (Id., Ex. A; Ex. B at 36).  The CT scan of Plaintiff's heard showed a cerebral infarction (stroke) involving the medial aspect of the left occipital lobe of the brain, probably embolic in origin.  (Id., Ex. A; Ex. B at 37 & 90).  Dr. Malik referred Plaintiff to the WCH Emergency Department for neurological consultation and admission to the hospital.  (Id., Ex. A; Ex. B at 38-39, & 88-89).

---

[4]     According to Officer Breeden, on September 5, 2006, Plaintiff arrived at the MCI-H waiting area off the dispensary complaining that he was feeling dizzy and light-headed.  (Paper No. 17, Ex. 2). Officer Breeden brought this matter to the attention of a nurse who then spoke to Plaintiff.  Officer Breeden affirms that the nurse advised him that there was nothing wrong with Plaintiff and he should return to his housing unit.  (Id.).  After conveying this information to Plaintiff, Officer Breeden said Plaintiff became belligerent, argumentative, and refused to leave the dispensary waiting area.  (Id.).  Officer Breeden gave Plaintiff a direct order to return to his housing upon completion of the inmate chow line  (Id.).  Plaintiff demanded to see a supervisor and was advised that he could speak to a supervisor while en route to his housing unit.  (Id.) Officer Breeden claims that Plaintiff exited the waiting area and proceeded to his housing unit.  (Id.)  He denies using any sort of profane or abusive language or treating Plaintiff in an unprofessional manner.  (Id.)

On September 6, 2006, WCH performed a magnetic resonance imaging study ("MRI") of Plaintiff's brain, which showed a stroke involving the medial portion of the left occipital lobe, an infarction involving the splenium of the corpus callosum, and mild chronic small vessel disease. (Paper No. 12, Ex. A; Ex. B at 40-41). Plaintiff also underwent a carotid duplex study to detect occlusion of the carotid arteries. (Id., Ex. A; Ex. B at 42). According to Dr. Malik, the test showed that the blood flow in both carotid arteries was normal, indicating that the vessels were patent. (Id., Ex. A; Ex. B at 42). Plaintiff was discharged from WCH to the MCI-H infirmary on September 7, 2006. (Id., Ex. A; Ex. B at 43 & 91). He was observed and treated in the infirmary for two days. (Id., Ex. A; Ex. B at 44-57, 72, & 87). Dr. Malik prescribed aspirin and Plavix to prevent any further problems from the stroke and to prevent any additional strokes from occurring. (Id.) Plaintiff's discharge orders included neurological checks for two weeks and in-cell meals, along with scheduled visits to the hypertension and neurology clinics. (Id.).

On September 10, 2006, the nurse practitioner evaluated Plaintiff for his complaint that he had intermittent numbness and tingling in his hands. (Id., Ex. A; Ex. B at 58). Plaintiff's reflexes and pulses were normal, he had no signs of carpal tunnel syndrome, and fine motor skill coordination was present. (Id.). Plaintiff was advised to return to the dispensary if he had increased frequency or severity of symptoms. (Id.). Plaintiff's neurological status remained stable from September 12, to September 21, 2006. (Id., Ex. A; Ex. B at 59-67, & 73). He was seen by Dr. Malik in the CCC on September 21, 2006, and was found to be neurologically stable. (Id.). Dr. Malik affirms that Plaintiff's condition remains stable and he has had no evidence of any further strokes and therefore has not needed to return to the WCH for follow-up by the neurologist. (Id.; Ex. A). In November of 2006, Plaintiff was scheduled for visual field testing and to be seen by the optometrist. (Paper No. 12, Ex. B at 74).

2. Legal Analysis

Based on the facts presented, Defendants move this Court to dismiss the Complaint, or alternatively, grant summary judgment, on two grounds.  First, both Dr. Malik and Officer Breeden argue that the Complaint fails to state a claim against them.  Defendants also assert that Plaintiff was provided constitutionally adequate medical care.

Defendant Malik argues that no claims are raised against him in the Complaint.  Officer Breeden states that the Complaint is subject to dismissal because Plaintiff did not exhaust his administrative remedies with regard to his claims against the officer.  While no particularized allegations are raised against Dr. Malik and it remains unrefuted that Plaintiff failed to exhaust his administrative remedies, the court need not decide the case on the basis of these Rule 12(b)(6) arguments as it finds no Eighth Amendment violation with regard to Plaintiff's care.

A prisoner presenting a denial of medical care claim must prove two essential elements.  First, he must satisfy the "objective" component by illustrating a serious medical condition.  See Hudson v. McMillian, 503 U.S. 1, 9 (1992); Estelle v. Gamble, 429 U.S. 97, 105 (1976); Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995); Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998).  If this first element is satisfied, the prisoner must then prove the second subjective component of the Eighth Amendment standard by showing deliberate indifference on the part of prison officials or health care personnel.  See Wilson v. Seiter, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in Estelle, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Medical personnel

"must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." Id. at 837.  Health care staff are not, however, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  Id. at 844; see also Johnson v. Quinones, 145 F.3d at 167.  Mere malpractice or negligence does not violate the Eighth Amendment.  See Estelle, 429 U.S. at 106; Miltier v. Beorn, 896 F.2d 848, 852 (4th Cir. 1990).

There is no dispute that in September of 2006, Plaintiff was found unconscious in his cell and suffered a cerebral infarction-- a serious medical injury.  That he had complained of various medical problems in the months prior to this event is also evident.  Under the legal standards, however, Plaintiff has failed to demonstrate how the care provided to him by Dr. Malik and health care staff for his complaints of dizziness, numbness in his extremities, and changes in his vision was deliberately indifferent under the Constitutional standard announced in Estelle, 429 U.S. at 102-105. As noted by Dr. Malik, Plaintiff has no history of diabetes, but does have a history of hypertension. Consequently, when presenting his symptoms, Plaintiff was subject to neurological and blood pressure screenings.  Indeed, he was evaluated for sick-call requests and walk-up complaints and was examined by nurses, nurse practitioners, and Dr. Malik on approximately 10 occasions over a four-month period, beginning May of 2006, during which time his blood pressure medication was modified as necessary.  In the days leading up to the September 6, 2006 event, he was seen by health care personnel for dizziness and blurred vision, and his physical and neurological examinations were essentially normal.  When Plaintiff presented symptoms of ophthalmic deficits, Dr. Malik directed that neurological and blood pressure checks be taken over the course of the next five to seven days and that a CT scan be provided.  Although Plaintiff did suffer a stroke, probably from an embolic source, it is clear that Dr. Malik and Officer Breeden's actions, did not amount to an act or omission

"for the very purpose of causing harm or with knowledge that harm will result." <u>Farmer</u>, 511 U.S. at 835. Thus, a constitutional deprivation has not been proved.[5]

IV. <u>CONCLUSION</u>

For the aforementioned reasons, Defendants' Motions for Summary Judgment is hereby granted. Judgment is entered in favor of Defendants and against Plaintiff. A separate Order shall follow.

Date: May 3, 2007                                /s/
                                                                   ROGER W. TITUS
                                                       UNITED STATES DISTRICT JUDGE

---

[5] Insofar as Plaintiff alleges that Dr. Malik and other healthcare professionals misdiagnosed and did not properly treat his symptoms for the onset of an infarction, he has set out, at best, a claim of negligence which is not actionable under § 1983.